# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

EDWARD EUGENE GARNER,

  *Petitioner,*

  v.

WILLIAM HUTCHINGS,[1] *et al.,*

  *Respondents.*

2:15-cv-02430-JCM-DJA

ORDER

This represented habeas matter under 28 U.S.C. § 2254 comes before the court for a decision on the merits.

## *Background*

Petitioner Edward Eugene Garner ("petitioner" or "Garner") challenges his 2010 Nevada state conviction, pursuant to a jury verdict, of robbery with the use of a deadly weapon. He was adjudicated a habitual criminal and is serving a sentence of life with parole eligibility after a minimum of ten years served. (ECF No. 17-7.)

The claims and issues presented involve, *inter alia*: (a) review of a harmless-error determination by the state supreme court following a failure to give a defense instruction restating the elements of the offense in negative phrasing ("if you find that the state does

---

[1] It appears from the state corrections department's inmate locator page that petitioner currently is incarcerated at the Southern Desert Correctional Center. *See* https://ofdsearch.doc.nv.gov/form.php (retrieved May 2021, under identification number 75917). The department's website reflects that William Hutchings is warden of that facility. *See* https://doc.nv.gov/Facilities/SDCC_Facility/ (retrieved May 2021). At the end of this order, the court directs the clerk to substitute petitioner's current immediate physical custodian, Warden Hutchings, as a respondent for the prior respondents Cox and Filson, pursuant to, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

not prove . . .); and (b) a claim of ineffective assistance of trial counsel based on counsel's failure to challenge the reliability of the eyewitness identification in the case.

The court summarizes below trial evidence and related state court record material that serves as backdrop to its consideration of these and other issues in the case.[2]

Around midnight on or about February 24, 2010, Shane Stewart was driving north on Pecos Road in Las Vegas, Nevada. He had an issue with one of his tires and pulled into a convenience store parking lot at Pecos and Russell Road. He determined that he would not be able to drive the vehicle home, and he was unable to reach anyone to pick him up. He started walking north on Pecos, planning to either catch a late running bus or if not walk all the way home. (ECF No. 16-26, at 14-19, 47-48 & 59-60.)

According to Stewart's trial testimony, as he was approaching the intersection at Pecos and Tropicana Avenue walking on the west side of Pecos, he saw two men standing at a bus stop diagonally ahead of him to the north across Tropicana and on the east side of Pecos. The bus stop where the men were standing was out in front of Kelly's Pub. As or after Stewart crossed Tropicana and continued walking north on the west side of Pecos, one of the men yelled from across Pecos asking for a cigarette. Stewart replied that he did not smoke and kept walking. He thereafter heard footsteps running up behind him coming diagonally from across the street, and a voice calling for him to wait and angrily berating Stewart for having to chase him. (*Id.*, at 19-25 & 48-49.)[3]

_____

[2] The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the court has overlooked the evidence in considering petitioner's claims.

[3] The transcript of Stewart's preliminary hearing testimony confirms that Stewart's trial testimony correctly is read as reflecting that (a) the bus stop where the men were located was north of Tropicana on Pecos; and (b) Stewart had crossed or was crossing Tropicana when the man yelled across Pecos for a cigarette. (ECF No. 16-7, at 3-4 & 7.) The prosecution used two maps at trial as demonstrative aids during testimony, which were filed in the trial record as exhibits, so that the jury could clearly see where a witness was referring. (*E.g.,* ECF No. 16-26, at 17-23.) The prosecution did not use a map during Stewart's testimony at the preliminary hearing, and that testimony therefore was more clearly explicit as to location. In his trial testimony, Stewart placed the bus stop out in front of Kelly's Pub, which was on the north side of Tropicana facing Pecos. Garner's testimony also placed Kelly's Pub, the bus stop, and himself on the east side of Pecos north of Tropicana when he first interacted with Stewart. (*See* ECF No. 17, at 30-36.)

When Stewart stopped and turned around, the man who had asked for a cigarette was coming toward him from then about ten to fifteen feet away. Stewart testified that he got a look at the man's face and what he was wearing. The man asked Stewart for money in an aggressive and angry tone, initially asking for a couple of dollars. Stewart said that he did not have any money and kept walking, but the man continued to follow him repeatedly asking for money. (*Id.* at 19-31.)

According to his testimony, Stewart eventually stopped again and faced the man. He first asked Stewart whether he "wanted to party." After Stewart declined, the man then told him that he wanted to show him something. The man then pulled a handgun from his backpack. It appeared to be a "dark color type, blackish . . . metallic type" semiautomatic, "the ones that have clips;" and it looked like a real gun to Stewart. The man was not holding the gun in a shooting position with his finger near the trigger. The man either put the gun back in his backpack or otherwise kept it out of view, as Stewart did not see the gun again thereafter during the incident. (*Id.*, at 31-35, 49-52 & 56-58.)

According to his testimony, Stewart started to walk away again. By this point, the two men were in a more residential, and thus more secluded, area on Pecos to the north of the commercial locations back at the intersection with Tropicana. The man followed Stewart, talking to him in an angry and aggressive manner, "trying to convey to [Stewart] that he was a tough guy" and to intimidate Stewart. The man then got in front of Stewart, jumping around "like a boxer;" and he blocked Stewart from walking any further, boxing him in. He told Stewart that he had "better come up with twenty dollars or you're going to get hurt or you're going to get shot." The man then put his hand up against Stewart's face, making physical contact and further intimidating him. Stewart felt that the man was going to shoot him if he did not give him his money. (*Id.*, at 35-4, 52-54 & 57-59.)

Stewart testified that he told the man that he did not have twenty dollars and that the money in his wallet was all that he had. Stewart pulled out his wallet, and the man reached into the wallet and took a five dollar bill and "a few" ones. The man then ran south on Pecos, back toward the intersection with Tropicana. (*Id.*, at 41-43, 54-55 & 59.)

3

At the next intersection to the north on Pecos, Stewart turned the corner out of sight to the south on Pecos and called 911 on his cell phone. He reported the robbery and gave a description of his assailant. Stewart placed the call "[t]hree minutes, three to five; five at the most" after the robbery; and he told the 911 operator that he could see a patrol officer in the area as he was making the call. (*Id.*, at 43-46 & 55.)

Officer Derek Jappe with the Las Vegas Metropolitan Police Department ("Metro") testified as follows. When he received the initial dispatch at approximately1:09 a.m., he was around the Harmon and Mountain Vista area, which is to the east and north of Pecos and Tompkins. Officer Jappe arrived at Stewart's location at 1:12 a.m. Stewart gave Officer Jappe the same description that he had given to the 911 operator and that had been sent out in the initial dispatch. Both times, Stewart described the assailant as an African-American male wearing a red "do-rag" (head cover) and a black jacket, who was carrying a black backpack, and who robbed him with a gun. Stewart told Jappe that the man had run south on Pecos after the robbery. Officer Jappe immediately broadcast all of this information to other patrol officers. (*Id.*, at 61-64 & 67-72.)

Metro Officer Jason Rapozo testified as follows. At 1:16 a.m., approximately seven minutes after the initial 1:09 a.m. 911 call and dispatch, he observed an individual heading south at Pecos and Tropicana that he believed matched the dispatch description. The individual was an African-American male wearing a red do-rag carrying a black backpack. Rapozo observed no other individuals in the area matching the description. Officer Rapozo stopped the individual, who he identified at trial as petitioner Garner. (*Id.*, at 73-83, 90-91 & 94.)

The testimony, collectively, of Stewart and the two officers reflects that Officer Jappe brought Stewart the short distance over to Officer Rapozo's location for a one-on-one showup. Jappe told Stewart beforehand that the officers did not want him to identify the wrong person and to focus on facial expression and how the person looked because people sometimes change clothes. In the showup at Officer Rapozo's location, Stewart positively identified Garner as the man who robbed him, with Stewart being seated in

Jappe's patrol vehicle during the showup. Stewart was "100 percent" certain in the identification at the time of the showup and had "no doubt" as to the identification at trial. (*Id.*, at 25-26 & 46-47 (Stewart); *id.*, at 64-67 & 69-70 (Jappe); *id.*, at 83 (Rapozo).)

Officer Rapozo testified that he then, *inter alia*, asked Garner whether he had any weapons on him. Garner responded that he may have a BB gun in his bag. After first obtaining Garner's consent, Officer Rapozo searched Garner's backpack. Rapozo initially could not find a gun after searching the main compartment and a second compartment. He then located an additional zippered compartment, where he found a black BB gun and eight dollars, consisting of a five and three ones.[4] The gun and currency were together in that compartment without anything else being in the compartment. Garner, who had been within earshot of the police radio after being stopped by Officer Rapozo, then stated to Rapozo that they had the wrong guy because there were eight dollars rather than seven. Stewart's report that the assailant had stolen seven dollars previously had been broadcast on the police radio. (*Id.*, at 83-90 & 91-93.)

The BB handgun was styled to look like a real M1911 type pistol. The gun was capable of firing BBs. When Rapozo recovered it, the gun was loaded with BBs and Garner had a $CO_2$ cartridge (the gun was gas operated) with the gun. (*Id.*, at 86-87 & 89-90 (Rapozo); *id.*, at 113-16 & 118-22 (forensic firearms examiner).)

The police took pictures of how Garner appeared when he was stopped and taken into custody, including at the time of the showup. Stewart confirmed at trial that that was how his assailant was dressed at the time of the robbery. Further according to his testimony, the gun in evidence looked similar to the gun that Garner had; and there was nothing about the gun in evidence that was different from the gun that he saw then. (*Id.*, at 27-28 & 36 (Stewart); *id.*, at 90 (Rapozo); *see also*, *id.*, at 141-43 (description of photos by counsel during argument).)

---

[4] Officer Rapozo did not expressly state during his testimony that the bills recovered consisted specifically of a five and three ones. He did not necessarily need to so state because pictures of the items recovered – which showed the jury the denominations of the currency – were admitted into evidence during his testimony. (*See* ECF No. 16-26, at 85-86.) The State referred during the closing argument specifically to the five and ones reflected by the evidence at trial. (ECF No. 17, at 73.)

At the February 26, 2010, initial arraignment following Garner's arrest, the justice court scheduled a preliminary hearing for March 12, 2010. On March 8, 2010, defense counsel filed a motion for corporal lineup, *i.e.,* to see if Stewart could positively identify Garner as his assailant from a physical lineup consisting of other males with similar physical characteristics. When the motion came on for hearing, however, counsel orally withdrew the motion so that it would not interfere with the preliminary hearing, which he wanted to proceed as scheduled. At approximately the same time, defense counsel gave the state and the district court a *Sargent* notice, *i.e.*, a notice that Garner was waiving his personal appearance at the preliminary hearing.[5] (ECF No. 16-1, at 2; ECF Nos. 16-4 through 16-6.)

At the preliminary hearing, at defense counsel's request, Garner was held by custodial staff outside the courtroom until after the evidentiary presentation. Stewart identified Garner as the assailant from a February 24, 2010, Metro booking photo.[6] Defense counsel cross-examined Stewart extensively with regard to the identification. (ECF No. 16-7, at 7-10; ECF No. 16-8.)

The defense did not refile a motion for corporal lineup thereafter. Nor did the defense seek to suppress the identification evidence pretrial based upon an allegedly unnecessarily suggestive identification procedure. The motion to suppress that the defense did file raised instead a Fourth Amendment challenge to Officer Rapozo's stop of Garner. (*See* ECF Nos. 16-20 through 16-22.)

The defense opening statement at trial essentially left the defense's options open. The preliminary statements made by counsel about the case were sufficiently general

---

[5] *See State v. Sargent*, 122 Nev. 210, 128 P.3d 1052 (2006). The transcript refers to the defense transmittal of the *Sargent* notice (as a *Sargent* "motion") – provided by the defense "to the State today in court" – during the brief hearing set for the motion for corporal lineup. (ECF No. 16-6, at 3.) This court references this detail to highlight the strategic choice made by defense counsel in the essentially contemporaneous actions. It would appear that counsel opted to not then proceed with the lineup motion, at least at that time, in order to proceed with the scheduled preliminary hearing without Garner being available in court for a potentially confirming or reinforcing in-court identification at the preliminary hearing. *Cf. Sargent*, 122 Nev. at 215, 128 P.3d at 1055 (referring to the state's plan in that case for an in-court identification at the preliminary hearing being "obviously frustrated if the defendant waives his appearance").

[6] Inherently, of course, no jury was present when the booking photo was used for identification.

6

that the defense potentially could challenge any facet of the state's case, including the identification evidence.  (*See* ECF No. 17, at 136-38.)

After the state rested at trial, the defense also initially rested without Garner having opted to testify.  Overnight, however, Garner changed his mind and wanted to testify, against his counsel's "preference."  The trial court allowed the defense to reopen the defense case, and Garner took the stand.  (ECF No. 16-26, at 123 & 127-28; *see also id.*, at 95-101; ECF No. 17, at 14-16, 17-18 & 23-24; *see also id.*, at 19-23.)

In his testimony, Garner confirmed Stewart's testimony that Garner was present at the bus stop north of the intersection of Tropicana and Pecos at the relevant time, that Garner was dressed and carrying a backpack as Stewart had described and as reflected in the police photos, that Garner and Stewart interacted in some fashion at that time, that Garner had the BB gun, and that Stewart likely saw the gun at some point.  (ECF No. 17, at 24-25, 30-36, 46-47 & 55-60.)

Garner disputed instead what happened.  According to Garner's testimony, he was sitting at the bus stop drinking beer when he saw Stewart approaching from the south on the east rather than the west side of Pecos.  He testified that Stewart first walked several feet past the bus stop where Garner was sitting several feet from his uncle but that Stewart then came back and sat down between them.  Garner then sought, over multiple hearsay objections by the state, to establish that Stewart wanted him to buy some "speed" (*i.e.,* some form of amphetamine-related drug) and that Stewart propositioned him for homosexual activity.  According to Garner, he was on the way to an apartment to the south on Pecos to buy some speed for Stewart when he was stopped by Officer Rapozo.  Garner suggested that Stewart called the police perhaps because Stewart was high from smoking speed with Garner's uncle and/or Stewart wanted the money back that he had given to Garner to buy more speed.  (*Id.*, at 33-49 & 59-63.)

Garner maintained that Stewart must have seen the gun when Garner was looking in his backpack for one reason or another.  He further maintained that he had more than thirty dollars on him when Officer Rapozo stopped him, but that all of the money did not

7

get booked into evidence by Metro. He suggested that this was a common occurrence with the police. (*Id.*, at 36-37, 61 & 63-66.)[7]

### *Governing Standard of Review*

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.*, at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the supreme court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.,* at 181-88.[8]

A state court decision is "contrary to" law clearly established by the supreme court only if it applies a rule that contradicts the governing law set forth in supreme court case law or if the decision confronts a set of facts that are materially indistinguishable from a supreme court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the supreme court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.*

---

[7] Because Garner took the stand, the state was able to seek to impeach his credibility with his prior felony convictions, including a 1999 conviction for possession of a controlled substance, another 1999 conviction for possession of a controlled substance with intent to sell, a 2003 conviction for robbery, and a 2010 conviction for attempt theft. (ECF No. 17, at 50-55; *see also id.*, at 19-23; *see also* ECF No. 16, at 100-01.) Garner also very obviously sought to induce a mistrial by referring multiple times to then being in jail, following upon an early incident at trial where a juror had walked almost into the courtroom at a time when Garner was not there. (ECF No. 17, at 22-29 & 50; *see also* ECF No. 16-26, at 5-13.)

[8] The court discusses the extent to which the deferential AEDPA standard of review applies to particular claims, *infra*, in the discussion of those claims.

8

Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the supreme court] is, at best, ambiguous." *Id.,* at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of supreme court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of supreme court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Esparza*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.*, at 973. Rather, AEDPA requires substantially more deference to the state court factual finding:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

In contrast, when the state courts have not adjudicated a claim on the merits, such as where the state courts rejected, or clearly would reject, the claim instead on procedural grounds, the above-described AEDPA deference on legal and factual issues does not apply. If the petitioner overcomes the procedural default, the federal courts then instead review the claim *de novo* on the merits. *E.g., Pirtle v. Morgan*, 313 F.3d 1160, 1165 & 1167-68 (9th Cir. 2002). However, in all events, under 28 U.S.C. § 2254(e)(1), any state court factual findings are presumed to be correct unless rebutted by clear and convincing

evidence, even where federal court review on the merits otherwise is *de novo.  E.g.,* 313 F.3d at 1168.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Pinholster*, 563 U.S. at 569.

### *Discussion*

### *Ground 1(a) – Lesser-Related Offense Instruction*

In ground 1(a),[9] Garner alleges that he was denied rights to due process and a fair trial under the Fifth and Fourteenth Amendments when the  trial court denied a request for an instruction on the misdemeanor offense of drawing a deadly weapon in a threatening manner, as a "theory of defense" instruction.  (ECF No. 15, at 8-10.)

The state supreme court rejected the claims presented to that court on the following basis in its September 13, 2012, order of affirmance on direct appeal:

> . . . Garner argues that the district court erred by failing to instruct the jury on the offense of drawing a deadly weapon in a threatening manner under NRS 202.320, which Garner claims is a lesser-included offense. But defendants in Nevada are not entitled to jury instructions on lesser-related, as distinguished from lesser-included, offenses.  *Peck v. State*, 116 Nev. 840, 845, 7 P.3d 470, 473 (2000), *overruled on other grounds by Rosas v. State*, 122 Nev. 1258, 147 P.3d 1101 (2006). Here, the district court correctly reasoned that NRS 202.320 is a lesser-related offense because it applies only when the accused draws the weapon in the presence of two or more persons. Therefore, we conclude that the district court did not abuse its discretion or commit judicial error in refusing Garner's requested instructions. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1001 (2001) (setting forth the standard of review for jury instructions).

(ECF No. 17-22, at 4.)

In his first amended petition, Garner alleged that the state supreme court's decision rejecting his claims of jury instruction error "was contrary to, or involved an unreasonable application of, clearly established federal law and was based on an unreasonable

---

[9] For ease of reference, the court has subdivided Garner's three claims of jury charge error in ground 1 into subgrounds 1(a), 1(b) and 1(c).  To the extent that certain discussion—such as discussion of the applicable standard of review—pertains to all three claims, the court discusses that point under ground 1(a) and refers back to that discussion in the discussion of grounds 1(b) and 1(c).

determination of the facts in light of the evidence presented." (ECF No. 15, at 12.)  He thus challenged the state court's rejection of the claims as not satisfying the deferential standard of review under AEDPA, a challenge that necessarily presupposes that the state court ruled on the merits of the federal claim.  After the respondents addressed the claim in their answer as so alleged by petitioner, Garner then asserted for the first time in the reply–contrary to the allegations in the first amended petition–that the state supreme court had not decided the federal claims in grounds 1(a) and 1(b) on the merits and that the claims thus were subject instead to *de novo* review.  (ECF No. 62, at 8 & 10.)

In any event, the mere fact that the state supreme court did not explicitly address a federal claim in its discussion does not *ipso facto* lead to the conclusion that *de novo* review applies.  There instead is a strong presumption that the federal claim also was rejected, such that the AEDPA deferential standard of review applies.

In *Johnson v. Williams*, 568 U.S. 289 (2013), the supreme court rejected the proposition that *de novo* review is automatically required whenever a state court does not expressly address a claim in a decision that discusses other claims:

> Our reasoning in [*Harrington v. Richter*, 562 U.S. 86 (2011)] points clearly to the answer to the question presented in the case at hand.  Although *Richter* itself concerned a state-court order that did not address *any* of the defendant's claims [in a summary denial of relief], we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims. There would be a reason for drawing a distinction between these two situations if opinions issued by state appellate courts always separately addressed every single claim that is mentioned in a defendant's papers.  If there were such a uniform practice, then federal habeas courts could assume that any unaddressed federal claim was simply overlooked.

> No such assumption is warranted, however, because it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference.  On the contrary, there are several situations in which state courts frequently take a different course.

568 U.S. at 298 (emphasis in original).

The supreme court referred to, *inter alia*, two such situations where state courts often did not discuss claims referenced in passing in a party's appellate filings:

> . . . [A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim. Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development. . . . . State appellate courts are entitled to follow the same practice.
>
> [Further], there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion. . . . . While it is preferable for an appellate court in a criminal case to list all of the arguments that the court recognizes as having been properly presented, see R. Aldisert, *Opinion Writing* 95–96 (3d ed. 2012), federal courts have no authority to impose mandatory opinion-writing standards on state courts, *see Coleman v. Thompson*, 501 U.S. 722, 739, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[W]e have no power to tell state courts how they must write their opinions"). The caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind.

568 U.S. at 299-300 (additional citations and statistical reference footnote omitted).

The supreme court accordingly held that federal courts must apply a "strong [presumption] that may be rebutted only in unusual circumstances" when presented with a state court order that does not expressly address every claim presented:

> In sum, because it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the *Richter* presumption in cases like the one now before us. When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted.

568 U.S. at 301.

In the present case, it does not appear that "unusual circumstances" are presented that would overcome the presumption required by *Williams*. Garner only conclusorily asserts that *de novo* review applies, without addressing *Williams* and without presenting

any argument seeking to rebut the strong presumption that applies.  It would appear that the state supreme court simply did not explicitly discuss parallel federal claims where the court rejected Garner's more specifically articulated state law argument that had served as the principal underlying premise for his federal claims.  Absent unusual circumstances not demonstrated here, such a common situation is subject to the *Richter-Williams* presumption.

The court therefore reviews ground 1(a) under AEDPA's deferential standard of review.  Under *Richter*, where a state court had denied a federal claim without explicit discussion, the federal court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the supreme court.  *Richter*, 562 U.S. at 102.

The state supreme court's rejection of the federal claim in ground 1(a) was neither contrary to nor an objectively unreasonable application of clearly established federal law at the time of the court's September 13, 2012, decision.  The supreme court held in *Hopkins v. Reeves*, 524 U.S. 88 (1998), that state courts are not constitutionally required to instruct juries on lesser related offenses.  Garner cites no apposite supreme court authority as of the time of the state supreme court's decision that would require the state court to disregard the otherwise directly applicable holding in *Reeves* simply because a defendant had characterized the requested lesser-related offense instruction as a "theory of defense" instruction.  Ground 1(a) does not provide a basis for federal habeas relief.[10]

---

[10] The only supreme court decisions directly cited by petitioner, *Mathews v. United States*, 485 U.S. 58 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984), are inapposite.  The state supreme court was not required to ignore the specifically applicable holding in *Reeves* based on argument drawn from general statements in *Mathews* and *Trombetta* regarding entitlement to theory-of-defense instructions and the right to present a defense.  The multiple, also inapposite, federal circuit decisions cited by Garner do not constitute "clearly established Federal law, as determined by the Supreme Court of the United States" as is clearly specified in and required by § 2254(d)(1).  The state supreme court need not follow federal circuit cases, with the caveat that this court is bound by Ninth Circuit holdings as to what constitutes clearly established law for purposes of AEDPA.  Garner cites no such directly apposite Ninth Circuit precedent establishing that supreme court precedent required that the instruction be given, *Reeves* notwithstanding.

Garner further urges that the state supreme court "was wrong because there is a long line of Nevada cases specifically holding that defendants, in fact, are entitled to jury instructions on 'lesser-related'

***Ground 1(b) – Presumed Innocent "Until" Rather Than "Unless" Proven Guilty***

In ground 1(b), petitioner alleges that he was denied rights to due process and a fair trial when the state trial court instructed the jury that he was presumed innocent "until" the contrary is proved rather than "unless" the contrary is proved.  Garner alleges that the court's use of the word "until" rather than "unless" undercut his presumption of innocence and diminished the State's burden of proof.  He maintains that use of the word "until" "suggests inevitability, something that will happen but has not happened yet."  (ECF No. 15, at 8, 10-11 & 12.)

The state trial court instructed the jury, *inter* alia, as follows:

> The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt each and every material element of each and every crime charged and that the Defendant is the person who committed each and every offense.
>
> . . . . .
>
> If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

(ECF No. 17-1, at 13.) (statement of reasonable doubt standard omitted)

The first and last sentences of the above instruction substantially tracked the language of N.R.S. 175.191, which also used the word "until" rather than "unless."  The

---

offenses." (ECF No. 62, at 7.)  There are multiple problems with this argument.  First, the state supreme court, not this court, is the final arbiter of Nevada state law, both generally and as applied to Garner's case.  Second, an alleged error by a state court in the application of state law does not provide a basis for federal habeas relief.  *E.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 & 71-72 (1991).  Third, Garner is just wrong on Nevada state law at the relevant time.  The "long line" of cases on this point to which he refers was *overruled* by the state supreme court in *Peck v. State*, 116 Nev. 840, 845, 7 P.3d 470, 473 (2000), *overruled on other grounds by Rosas v. Nevada*, 122 Nev. 1258, 1269, 147 P.3d 1101, 1109 (2006), *in turn abrogated on other grounds by Alotaibi v. State*, 133 Nev. 650, 404 P.3d 761 (2017).  A cite check of many of the cases cited by Garner, and in particular the previously lead decision in *Moore v. Nevada*, 105 Nev. 378, 776 P.3d 1235 (1989), would quickly reveal that to be the case—as would reading *Peck*, which was directly cited by the state supreme court.  The argument thus is both irrelevant and incorrect.

The court additionally notes—in passing—that Stewart testified that Garner displayed the weapon to him when they were across the street from the bus stop and to the north on Pecos, a major thoroughfare, as opposed to in the presence of the other individual back at the bus stop.  Garner's testimony places all three men instead at the bus stop, but in his testimony he does not display the weapon and Stewart just views the gun by happenstance while Garner is rummaging through his backpack.  If a jury believed Stewart's testimony regarding the display of the weapon, the predicate of display in the presence of two or more individuals (other than the defendant) for the lesser-related offense would not appear to be satisfied.

instructions included multiple references directly or indirectly reinforcing the points that the state was required to prove the elements of an offense beyond a reasonable doubt before the jury could convict and/or that it was the province and duty of the jury to determine whether—or not—the defendant was guilty. (ECF No. 17-1, at 4, 7, 9, 17, 20 & 23.) The court further instructed the jurors that "you are not to single out any certain sentence or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole and regard each in the light of all the others." (*Id.*, at 3.)

The state supreme court rejected the claims presented to that court on the following basis in its September 13, 2012, order of affirmance on direct appeal:

> . . . Garner argues that the district court abused its discretion by overruling his objection to the jury instruction on the presumption of innocence because the instruction marginalized the State's burden of proof. Here, the jury instruction was a correct statement of the law and therefore the district court did not abuse its discretion. *See* NRS 175.191; *Blake* [*v. State*, 121 Nev. 779, 799, 121 P.3d 567, 580 (2005)] (rejecting challenge to use of the word "until" in instruction).

(ECF No. 17-22, at 5-6.)

The *Blake* decision referenced in the court's order previously had held as follows:

> Blake further contends that, over his objection, the district court provided an inadequate jury instruction concerning the presumption of innocence. The challenged instruction tracked the language of NRS 175.191 and provided in part: "The Defendant is presumed innocent until the contrary is proved." Blake argues that the word "until" nullified the presumption of innocence by implying that his guilt would eventually be proven beyond a reasonable doubt. However, read as a whole, the instruction did not imply this. The instruction also defined reasonable doubt in accordance with NRS 175.211 and concluded: "If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty." The instruction plainly contemplated that guilt might not be proven. Accordingly, we deny relief on this basis.

121 Nev. at 799, 121 P.3d at 580.

Similar to ground 1(a), in the first amended petition, Garner challenged the state supreme court's rejection of ground 1(b) as not satisfying the deferential standard of review under AEDPA. (ECF No. 15, at 12.) Thereafter, after respondents had answered the claim on this basis, he asserted for the first time in the reply that the state court had not decided the federal claim in ground 1(b) and that the claim thus was subject instead to *de novo* review. (ECF No. 62, at 10.)

This court is not persuaded. As discussed above regarding ground 1(a), there is a strong presumption that the state court decided the claim on the merits. In his cursory late-breaking argument, Garner presents no argument recognizing and then seeking to overcome this strong presumption with a showing of unusual circumstances. One of the general circumstances recognized in *Williams* where state courts often will not explicitly discuss a federal claim separately is where rejection of any related state law claim necessitates rejection also of the federal claim. *See* 568 U.S. at 298-99. Here, from the text of the state supreme court's order, it is abundantly clear that the court understood that it was rejecting a claim of jury-instruction error that the defendant contended had adversely impacted his constitutionally protected presumption of innocence because it allegedly diminished the state's burden of proof. The state supreme court's reliance on its prior *Blake* decision reflects that the court, based on a reading of the instructions as a whole, disagreed with Garner's underlying premise "that the word 'until' nullified the presumption of innocence by implying that his guilt would eventually be proven beyond a reasonable doubt." Once the state high court disagreed with Garner's underlying premise, there in truth was no necessity for the court to further state explicitly that "we therefore do not find that Garner's constitutional right to a presumption of innocence was violated" and/or to explicitly discuss and distinguish his specific federal case citations. From the state supreme court's order and the nature of the claim, it is clear that the court "understood itself to be deciding a question with federal constitutional dimensions." 568 U.S. at 305. Federal courts, again, "have no authority to impose mandatory opinion-writing standards on state courts," 568 U.S. at 300, particularly where it is abundantly

clear from the very context of the claim presented that the state court would understand itself to be deciding a question inherently with federal constitutional dimensions. This court therefore applies deferential review under AEDPA to ground 1(b).

The state supreme court's rejection of ground 1(b) was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the supreme court as of the time of the state court's September 13, 2012, decision.

Garner does not cite any supreme court authority establishing specifically that use of the word "until" rather than "unless" in this context violates the constitution. The only supreme court authority that he cites establishes only the general proposition that a defendant generally is entitled to an instruction on the presumption of innocence, without addressing whether this particular language is satisfactory. Garner instead relies upon argument tending to establish only that: (a) the Ninth Circuit cases relied upon by respondents that upheld instructions that used "until" were not presented with a challenge to the use of that word; (b) the Ninth Circuit decision in *United States v. Lopez*, 500 F.3d 840 (9th Cir. 2007), upholding an instruction using "unless and until" was not presented with the "until" versus "unless" issue and the court of appeals thus "has never decided whether the stand alone use of 'until' is sufficient;" and (c) the pattern jury instructions for six federal circuits use instead either "unless" or "unless and until" rather than "until," with the other numbered circuits either using alternative language or not having pattern jury instructions. Garner urges that "[a]ll signs point to [use of "until"] being insufficient under the law." (ECF No. 62, at 9-13.)

Overturning a state conviction based on such "signs" would be the antithesis of deferential review under AEDPA. The supreme court clearly has not decided the issue and there thus is no clearly established federal law holding that use of the word "until" unconstitutionally diminishes the presumption of innocence. Federal circuit decisions, particularly such decisions not even considering the issue, do not constitute such clearly

established federal law.  Nor do federal circuit pattern or model jury instructions constitute precedent of the supreme court.[11]

Moreover, a simple computerized legal research query reveals that the supreme court and the lower federal courts have referred extensively, and also for an extensive period of time, to the presumption as applying "until" the prosecution proves to the contrary.[12]  Indeed, opinions frequently refer to the principle, as so stated using the word "until," as a "fundamental" or "bedrock" principle of the American criminal justice system.[13]

---

[11] Indeed, pattern or model jury instructions generally do not constitute authoritative precedent *even within the circuits*, much less precedent binding on state courts.  The instructions typically are not officially adopted by the circuit itself as opposed to being issued by a panel of, *e.g.*, district judges, and they serve only as nonmandatory guidelines rather than binding authority.  *See,e.g., United States v. Appolon*, 695 F.3d 44, 63 n.8 (1st Cir. 2012); *United States v. Maury*, 695 F.3d 227, 259 (3rd Cir. 2012) ("not binding on this, or any, court"); *United States v. Sherrod*, 33 F.3d 723, 725 (6th Cir. 1994); *United States v. Cornelison*, 717 F.3d 623, 628 (8th Cir. 2013); *United States v. Carter*, 776 F.3d 1309 (11th Cir. 2015).  Review of the preamble to circuit pattern or model jury instructions typically includes language similar to the introduction to the Ninth Circuit model instructions, which states, *inter alia*, that "[t]he Ninth Circuit . . . does not adopt these instructions as definitive."  *Ninth Circuit Manual of Model Criminal Jury Instructions*, at vi (West 2010).  Overturning a state conviction because a state court jury instruction did not line up with language in federal circuit pattern jury instructions again would be the very antithesis of deferential review under AEDPA.

[12] The court utilized the following query:  "presum! /s innocen! /s until /s guilt!".  *See,e.g., Ramos v. Louisiana*, 140 S.Ct. 1390, 1396 (2020); *Betterman v. Montana*, 136 S.Ct. 1609, (2016); *Agnew v. United States*, 165 U.S. 36, 51-52 (1897) (rejecting a challenge to the failure to use the defense instruction on presumption of innocence, where both the charge requested and the charge given used the word "until," with the supreme court stating that the charge given was "quite correct," albeit without a challenge being raised to the use of the term "until"); *Coffin v. United States*, 162 U.S. 664, 681-82 (1896) (it was "not possible" for the jury to have inferred that the court was instructing the jury that a predicate for the defendant's guilt had been established where the jury was given a presumption of innocence instruction, which used the word "until," albeit without the use of that term being challenged); *Martineau v. Angelone*, 25 F.3d 734, 743 (9th Cir. 1994); *Williams v. United States*, 93 F. 396, 399 (9th Cir. 1899); *see also* 2 J. Story, *Commentaries on the Constitution of the United States* § 777, p. 248 (1833) ("in common cases, the law . . . presumes every man innocent, until he is proved guilty").

The fact that none of the above-cited authorities addressed an issue as to whether the use of the word "until" rather than "unless" in a jury instruction diminished the prosecution's burden of proof does not at all help Garner's argument when applying AEDPA's deferential standard of review.  He must not merely distinguish authority but instead must demonstrate that the state supreme court's decision was either contrary to or an unreasonable application of a holding, and not merely *dicta*, by the supreme court.  He has not done so here.

[13] *E.g., Deck v. Missouri*, 544 U.S. 622, 630 (2005) ("fundamental legal principle . . . [that] 'lies at the foundation of the administration of our criminal law'"); *United States v. Solano*, 966 F.3d 184, 194 (2nd Cir. 2020) ("bedrock").

The court notes also that Nevada is not the only state that has codified this bedrock principle in its statutory law similarly using the word "until" rather than "unless."  *See,e.g.,* Cal.Penal Code Ann. § 1096 (West 1995); Ohio Rev. Code Ann. § 2901.05(A) (West 2008). Given the extensive prior authority also employing that term, it is highly doubtful that these state legislatures contemplated that they allegedly were diminishing rather than upholding the presumption of innocence by using this term.

It would be a curious holding indeed, even on a *de novo* review, that concluded that over two centuries of federal jurisprudence instead was diminishing the very bedrock principle that it lauded and sought to uphold when it used the word "until" rather than "unless." Perhaps petitioner's "inevitability" reading of the word "until" is not the only possible connotation of the term when used in this context. Perhaps the word as used in this context, for over two centuries now of repeated usage, instead conveys that if the state fails to prove to the contrary, then the presumption of innocence continues on, including through the resulting acquittal.

In all events, the state supreme court's conclusion that the use of the word "until" in this case did not unconstitutionally diminish the presumption of innocence was neither contrary to nor an objectively unreasonable application of the holdings of the supreme court. The state supreme court in particular could reasonably conclude that the use of the word "until" did not unconstitutionally diminish the presumption when read in the context of the instructions as a whole, which clearly placed the burden of proof on the state to prove guilt beyond a reasonable doubt and which instructed the jury to acquit if the jury had a reasonable doubt as to guilt.

Ground 1(b) does not provide a basis for federal habeas relief.

### Ground 1(c) – "Negatively phrased *Crawford* Instruction"

In ground 1(c), petitioner alleges that he was denied rights to due process and a fair trial when the state trial court declined to give a defense instruction that restated the instruction stating the elements of the offense in negative phrasing ("if you find that the state does not prove . . . you must find the defendant not guilty") rather than the positive phrasing of the elements used in the instructions. He maintains that the state supreme court decision in *Crawford v. Nevada*, 121 Nev. 744, 121 P.3d 582 (2005), required that the negatively-phrased defense instruction be given.

The corresponding positively-phrased instruction given at trial read as follows:

Robbery is the unlawful taking of personal property
from the person of another, or in his presence, against his will,
by means of force or violence or fear of injury, immediate or

future, to his person or property. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking, in either of which cases the degree of force is immaterial. Such taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear. The value of property or money taken is not an element of the crime of Robbery, and it is only necessary that the State prove the taking of some property or money.

(ECF No. 17-1, at 5.)

Instruction No. 12 further instructed the jury on the presumption of innocence, the state's burden of proof, and the reasonable doubt standard. (*See* ECF No. 17-1, at 13.)

The negatively-phrased proposed instruction requested by the defense read:

If you find that the state does not prove beyond a reasonable doubt that the defendant unlawfully took personal property from the person of another by means of force or violence or fear of injury, immediate or future, to his person or property, or of anyone in his company at the time, you must find the defendant not guilty of robbery.

(ECF No. 17-3, at 13.)

The state supreme court held in pertinent part as follows in its September 13, 2012, order of affirmance on direct appeal:

. . . Garner contends that the district court erred by refusing to give a negatively phrased instruction relating to the robbery charge. Negatively phrased position or theory instructions should be given upon request, and a '"positive instruction as to the elements of the crime does not justify refusing a properly worded negatively phrased"' instruction. *Crawford v. State*, 121 Nev. 744, 753, 121 P.3d 582, 588 (2005) (*quoting Brooks v. State*, 103 Nev. 611, 614, 747 P.2d 893, 895 (1987)). Here, Garner requested a negatively phrased instruction that supported his theory of defense. Accordingly, we conclude that the district court abused its discretion by refusing the proffered instruction. *See Margetts v. State*, 107 Nev. 616, 618-620, 818 P.2d 392, 393-95 (1991) (concluding that, in a prosecution for swindling and obtaining money by false pretenses, the district court erred by refusing to give a negatively worded instruction regarding the lack of specific intent to defraud). But we further conclude that the error was harmless beyond a reasonable doubt. *See Carter v. State*, 121 Nev. 759, 767 n.23, 121 P.3d 592, 598 n.23

(2005) (applying harmless error analysis to the failure to give a negatively phrased instruction). Here, the record shows that the district court gave "positive instructions" which accurately instructed the jury on the elements of the crime and the prosecution's burden of proof. Further, substantial evidence supported Garner's conviction. Therefore, "we are convinced beyond a reasonable doubt that the jury's verdict was not attributable to the error and that the error was harmless under the facts and circumstances of this case." *Crawford*, 121 Nev. at 756, 121 P.3d at 590.

(ECF No. 17-22, at 4-5).

The harmless-error standard applied by the state supreme court was the harmless-error standard for federal constitutional violations articulated in *Chapman v. California*, 386 U.S. 18 (1967). *See Carter*, 121 Nev. at 767 n.23, 121 P.3d at 598 n.23 (citing to *Chapman* for the standard applied).[14]

The applicable test for whether a federal constitutional error was harmless varies with the procedural posture of the case. *Davis v. Ayala*, 576 U.S. 257, 267 (2015).

On a direct appeal, the standard from *Chapman* governs. Under *Chapman*, the burden is on the prosecution to prove beyond a reasonable doubt that the error did not contribute to the verdict, such that the reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. 386 U.S. at 24. Under *Chapman*, an error is not harmless if there is a reasonable possibility that the error might have contributed to the conviction. *Id.*

In contrast, on collateral review, such as in the present action, the standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), instead controls. Under *Brecht*, the record must demonstrate that the error resulted in actual prejudice. *E.g., Ayala*, 576 U.S. at 267. Federal habeas relief is appropriate under this standard only if the court has grave doubt

---

[14] To the extent, if any, that there might be a distinction between what the state supreme court held in *Crawford* vis-à-vis negatively-phrased instructions and what the supreme court ultimately might hold in that regard on federal review, such a distinction was not relied upon by the state high court in denying relief on Garner's federal constitutional claims. The state supreme court's stated rationale instead turned upon a harmless-error analysis. In their presentation in this court, both petitioner and respondents accept the premise that the state supreme court rejected the federal claims in ground 1(c) based on a harmless-error analysis; and neither side argues to the contrary of that premise. This court accordingly reviews ground 1(c) accordingly, as per the state supreme court's stated rationale and the positions taken by the parties.

whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *Id.*, at 267-68. *Brecht* requires more than *Chapman*'s reasonable possibility that the error might have contributed to the conviction, and the court instead must find that the defendant sustained actual prejudice from the error. *Id.,* at 268.

Under AEDPA, a federal court may not overturn a state court harmless-error determination unless the state court applied the *Chapman* standard in an objectively unreasonable manner. However, application of the *Brecht* standard subsumes the inquiry of whether the state court's application of the *Chapman* standard was objectively unreasonable. *See Ayala*, 567 U.S. at 268. That is, if the record demonstrates that the error was not harmless under *Brecht*, the petitioner will have established that the state court's application of *Chapman* was objectively unreasonable under AEDPA's deferential standard of review. *See,e.g., Fry v. Pliler*, 551 U.S. 112, 119-20 (2007); *Hall v. Haws*, 861 F.3d 977, 992 (9th Cir. 2017).

In the present case, the state court record does not demonstrate that Garner sustained actual prejudice as a result of the error under the state supreme court's *Crawford* decision.

Petitioner urges that "the evidence against Garner was far from overwhelming" because he allegedly "was convicted based on a highly suggestive identification . . . and little else." (ECF No. 62, at 15.) Yet Garner himself singlehandedly wholly eliminated any possible question at trial about identification with his testimony when he took the stand against the preference of defense counsel. He acknowledged in particular that he was present at the bus stop at the relevant time, that he was dressed and carrying a backpack as described by Stewart, that he interacted with Stewart in some fashion at the relevant time, that he had a BB gun, and that Stewart likely saw the gun at some point. (*See* text, *supra*, at 7.) After Garner's testimony, there was absolutely no question as to identification, *i.e.*, that Garner was the individual involved in the incident. Petitioner's argument that the conviction was based only on suspect identification evidence and little else thus completely misses the mark. A harmless-error analysis that focuses on actual

prejudice necessarily is conducted with reference to the case as it was actually tried, and in this trial Garner himself eliminated any question as to identification. As the state high court observed, the evidence of guilt at trial was "substantial," and this court's summary of the evidence herein reflects that to be the case. (*See* text, *supra*, at 2-5 & 7-8.)

Petitioner further relies, in his argument on harmless error, on *Estelle v. McGuire, supra*, for the proposition that an erroneous jury instruction that infects the entire trial with unfairness violates constitutional due process. *Cf.* 502 U.S. at 72 & 75. In *Estelle v. McGuire*, however, the supreme court did not find the presence of a jury instruction error on the record presented in that case; and the court therefore did not address any issue as to harmless error. 502 U.S. at 75. Indeed, the justices who believed that the above-stated merits standard instead was satisfied stated that *further* inquiry then was required on a remand to determine whether the error was harmless error. *See* 502 U.S. at 76 & 80 (O'Connor, concurring in part). The language from *Estelle v. McGuire* upon which Garner relies thus indisputably does not state a harmless-error standard, and the decision clearly does not hold that a jury instruction error purportedly satisfying the stated merits standard then cannot constitute harmless error.

*Brecht* instead states the governing harmless-error standard, and the record in this case does not demonstrate the actual prejudice required under that standard. The error was harmless error under the *Brecht* standard, and the state supreme court's application of the *Chapman* harmless-error standard accordingly was neither contrary to nor an objectively unreasonable application of clearly established federal law.

Ground 1(c) therefore does not provide a basis for federal habeas relief.

### Ground 2 – Effective Assistance of Counsel – Identification Evidence

In ground 2, Garner alleges that he was denied effective assistance of counsel when trial counsel failed to challenge the reliability of the victim's identification evidence. He maintains that counsel failed to challenge the initial showup identification as unnecessarily suggestive, failed to test the reliability of that identification with a multi-person lineup after withdrawing the motion for corporal lineup, and failed to object when

the state showed Stewart a single photograph for identification at the preliminary hearing. Garner alleges that counsel's failure to challenge the "two highly suggestive identification procedures" constituted deficient performance and that he sustained resulting prejudice "because it prevented him from pursuing any meaningful misidentification defense at trial." (ECF No. 15, at 12-15.)

Factual background related to this claim is summarized in the text, *supra*, at 2-8.

The court previously held that the ineffective-assistance claims in both grounds 2 and 3 were actually unexhausted but were technically exhausted by procedural default. The procedural default of the claims in turn was subject under the prior ruling to petitioner thereafter seeking to overcome the default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), based upon the absence of or ineffective assistance of state postconviction counsel. The court deferred consideration of that issue until after the filing of an answer and reply directed also to the underlying merits claims. (ECF No. 48.)[15]

Generally, to overcome a procedural default based upon the actual or projected application of an adequate and independent state law procedural bar, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *E.g., Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).[16]

Under *Martinez*, in the specific context pertinent to this case, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel, by demonstrating that either: (a) he had no counsel in the state postconviction proceeding in the state district court; or (b) such counsel was ineffective under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish such ineffective assistance of state postconviction counsel, a petitioner must demonstrate that:

---

[15] The court sets forth background law regarding the application of *Martinez* to grounds 2 and 3 that is pertinent to both claims here and cross-references back to this discussion within the discussion *infra* specifically of ground 3.

[16] The latter alternative is not at issue here.

(a) postconviction counsel provided deficient performance in failing to present the claim of ineffective assistance of trial counsel; and (b) there was a reasonable probability that the result of the postconviction proceeding would have been different if counsel instead had raised the claim. *E.g., Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019).

To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability (COA). *Id.* In pertinent part, a claim would warrant issuance of a COA, and thus is "substantial" for purposes of *Martinez*, if reasonable jurists could debate the proper disposition of the claim or the issue presented is adequate to deserve encouragement to proceed further. This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *Id. See generally Miller-El v. Cockrell*, 537 US. 322, 336-38 (2003) (COA standard).

In cases where the petitioner was represented by state postconviction counsel, there is substantial overlap between these criteria for both cause and prejudice under *Martinez* because the criteria all ultimately turn upon the strength or weakness of the underlying claim of ineffective assistance of trial counsel. *See Ramirez*, 937 F.3d at 1241-42; *Atwood v. Ryan*, 870 F.3d 1033, 1059-60 (9th Cir. 2017). [17]

On the underlying claim of ineffective assistance of counsel, the petitioner must show under *Strickland* that both: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) counsel's alleged defective performance caused actual prejudice. On the performance prong, the objective measure of counsel's performance is determined by looking at the reasonableness of his actions and inactions under then prevailing professional norms. The issue is not what counsel might have done

---

[17] *Martinez* additionally requires that: (a) the state court proceeding be an initial-review collateral proceeding for purposes of that decision; and (b) state procedural law sufficiently requires an inmate to present a claim of ineffective assistance of trial counsel for the first time in that proceeding. *E.g., Smith v. Baker*, 983 F.3d 383, 395 (9th Cir. 2020). Neither requirement is at issue in this case arising from Nevada.

differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Smith v. Baker*, 983 F.3d 383, 396-99 (9th Cir. 2020); *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

The determination of whether petitioner can overcome the procedural default of his claims is made *de novo*. *E.g., Ramirez*, 937 F.3d at 1243 & 1244; *see also Visciotti v. Martel*, 862 F.3d 749, 768-69 (9th Cir. 2017). If he does so on a claim, the claim then is reviewed *de novo* on the merits. *E.g., Rodney v. Filson*, 916 F.3d 1254, 1258 & 1262 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22; *Dickins v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (*en banc*).

In the present case, on ground 2, the court will assume *arguendo* that Garner did not have postconviction counsel in the state district court at a time relevant specifically to the assertion of ground 2, such that he can demonstrate cause under *Martinez* as to ground 2 on this basis.[18]

---

[18] The *arguendo* assumption in the text perhaps is subject to debate. To be sure, Garner proceeded *pro se* initially in the state postconviction proceedings in the state district court and on through an initial postconviction appeal. During that appeal, the state supreme court remanded for an evidentiary hearing on a claim that counsel had failed to timely convey Garner's acceptance of a plea offer but the court otherwise affirmed on Garner's other *pro se* claims. (ECF No. 18-31.) When the state district court appointed counsel on the remand – which would appear to be still part of the initial-review collateral proceeding – the only explicit limitation that the court placed on counsel's representation was that she could not "reargue it, re-litigate the issues that were affirmed, just the one that was remanded." (ECF No. 18-33, at 6.) That particular limitation vis-à-vis the previously-asserted claims of course made sense given the law of the case doctrine. The matter of additional claims that had not been the subject of the prior appeal was not expressly addressed during the initial status check proceeding. However, it perhaps would be fair to say that: (a) the general tenor of related discussion over the course of the entire proceeding tended to affirm that counsel was appointed for only the remanded claim; and (b) the appointment was not considered as a standard general appointment of counsel to pursue any and all possibly meritorious claims or issues – or even then-pending motions – for the petitioner. (*See* ECF No. 18-33 & 18-36.) That said, however, as discussed in more detail vis-à-vis ground 3, *infra*, when counsel did seek to pursue an additional claim at the evidentiary hearing, the district court allowed her to do so, without objection from the state. (*See* ECF No. 18-39, at 4-5, 76-79 & 82.)

Respondents appear to accept that postconviction counsel's representation was limited to only the one remand claim but then argue that she was not ineffective for not pursuing claims beyond that limited representation. (ECF No. 54, at 19-20.) This argument is flawed. If counsel's representation *arguendo* was limited to only one claim, then Garner *did not have representation* as to other claims. Such a lack of

26

The court concludes, however, that the underlying ineffective-assistance claim is not a substantial claim for purposes of *Martinez*, such that Garner therefore cannot demonstrate prejudice under *Martinez* to overcome the procedural default.

The court need look to only *Strickland*'s prejudice prong on the underlying claim to reach this conclusion.[19]

representation – an *absence* of postconviction counsel to represent petitioner on other claims – gives rise to cause under *Martinez*, not to an instead circular and question-begging ineffective-assistance analysis.

[19] A petitioner must prove both deficient performance and resulting prejudice to prevail on a *Strickland* claim. A reviewing court thus need reach only one of the two prongs if the petitioner fails to satisfy that prong. *E.g., Strickland*, 466 U.S. at 697.

The court's resolution of the issues presented under the prejudice prong does not at all imply that trial counsel necessarily rendered deficient performance. As the supreme court stated in *Richter*:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). . . . . Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . .
>
> . . . . .
>
> . . . . There are . . . "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." . . . . Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach. . . . .
>
> . . . . .
>
> . . . . Although courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam). . . . .

562 U.S. at 105, 106 & 109.

In this case, defense counsel clearly made an initial tactical decision to withdraw the motion for corporal lineup in order to not delay the preliminary hearing, at which he sought to frustrate further identification by not having Garner present. At that proceeding, counsel cross-examined Stewart extensively regarding the identification evidence. (ECF No. 16-7, at 7-10.) It would appear that, following the preliminary hearing, counsel opted to not seek to exclude the evidence pretrial, an effort that likely would not have succeeded given the discussion of the identification evidence *infra* in the text. Defense counsel's contemporaneous file notes reflect that Garner wanted to file a motion for corporal lineup subsequent to the preliminary hearing, but counsel told him "that's probably not a good idea but we can talk about it." (ECF No. 17-24, at 12.) That notation appears to reflect that counsel had made a strategic

Petitioner does not present a substantial claim in ground 2 with respect to *Strickland*'s prejudice prong even if the court – first – puts Garner's trial testimony entirely to the side and disregards it.

Garner urges that counsel should have challenged the showup. However, it is established law that "the admission of evidence of a showup without more does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Rather, "reliability is the linchpin in determining the admissibility of identification testimony" following a showup. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). Courts considering a claim that admission of identification evidence violates due process look to the following factors:

---

decision to not to seek to renew the motion for a corporal lineup—perhaps concluding after, *inter alia*, seeing Stewart testifying in person on the stand that a corporal lineup only would result in even more compelling identification evidence for the state.

In planning a defense, counsel also had to take into account what Garner had told him about the incident, whether Garner would follow through on statements expressing a desire to take the stand, and most especially what he then might say. The defense counsel file notes reflect that Garner told counsel, variously, in sequence over time during the defense representation: (a) initially that "it wasn't him;" (b) then that "he doesn't remember that night;" (c) then that "he was at the two gas stations on pecos and trop at the time the incident occurred;" (d) that "the guy saw him playing with the gun and then he also saw the gun because he saw that Garner had a sack [and] [h]e thinks the guy was gay because he asked if they wanted to party;" (e) that he had read that the state could not charge someone with robbery unless the victim was harmed and "this is like a case where a dude is walking down the strip with lots of money in his hand and another dude comes up to him and says hey how much money do you have and then yanks the money from the dude;" (f) that he wanted defense counsel to tell the prosecutor "that the guy was trying to do gay s___ to him and he didn't want to announce it to the free world, then the guy asked for speed and then the guy saw inside his bag and saw his gun . . . [and] the fool eventually opened his wallet to show Garner his money and garner [sic] took his money but he didn't rob him because the dude wasn't scared;" and (g) about ten days before trial, Garner related more or less the account that he testified to at trial, with Garner stating, *inter alia*, after counsel again advised against him testifying, that "[h]e doesn't care if testifying will lead to a conviction because he will be convicted anyway." (ECF No. 17-24, at 5-13, which is in reverse chronological order.) It would be a fair statement that the contemporaneous notes tend to reflect that defense counsel had no way of truly knowing heading into trial whether Garner would opt to take the stand, what he then might say in his testimony, and toward what end.

Particularly against the backdrop of the foregoing, counsel very well may have determined to focus more on other avenues to defend the case at trial together with or possibly in lieu of closing argument to the jury concerning the identification evidence. Under *Strickland*, strategic decisions made after counsel's adequate examination of an issue are "virtually unchallengeable." 466 U.S. at 690. Moreover, here, counsel may well have argued the case differently during closing argument had Garner not ultimately opted to take the stand against counsel's advice and then fully conceded that he was the man at the bus stop that night. (*See* text, *supra*, at 7.) No evidence has been tendered on federal habeas review that would undercut the otherwise applicable strong presumption that counsel's actions prior to Garner's ill-considered decision to testify, against counsel's advice, reflected trial tactics as opposed to sheer neglect.

In all events, however, the court resolves the issues presented as to ground 2 with reference instead to the prejudice prong of *Strickland*.

> .... The factors . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* This same reliability standard governs the admissibility of both the showup and of a later in-court identification. *See, e.g., Neil*, 409 U.S. at 198; *see also Manson*, 432 U.S. at 110 n.10 (under the totality of the circumstances approach, "if the challenged identification is reliable, then testimony as to it and any identification in its wake is admissible").

Here, the testimony canvassed previously reflects that Stewart had a fair amount of time to view his assailant during an extended interaction with the assailant including face-to-face interaction; Stewart testified that he specifically viewed the man's face as and after he crossed the street to interact with him; the description that Stewart gave to the police substantially lined up with Garner's appearance at the time; the showup occurred within minutes of the robbery; and Stewart was 100% certain in his identification both at the showup and in later in-court identifications. (*See* text, *supra*, at 2-5.) On that record, there is not a reasonable probability that a pretrial challenge to the identification evidence would have succeeded. Moreover, such a pretrial challenge was not required to be able to argue the issue in closing argument if counsel made a strategic decision to do so.[20]

---

[20] Garner suggests that "Stewart also said the robber was taller than him and Garner is actually shorter than Stewart." (ECF No. 62, at 20.) The record does not reflect, however, that Stewart's initial descriptions to the police included any such height estimate. Petitioner is referring instead to preliminary hearing testimony where Stewart testified on cross-examination as follows:

> Q: Do you remember how tall he was?
> A: He was taller than me.
> Q: So how tall are you?
> A: Five-eight, so I would say a couple inches taller than me, *I think.*
> I mean, he *seemed* taller.
> Q. Taller than five-eight, but you're not sure exactly how tall?
> A. Yeah.

(ECF No. 16-7, at 8, with emphasis added.) Petitioner relies upon the PSI report to purportedly establish that he is only 5'7" tall. (*See* ECF No. 62, at 18 & n.31.) Even assuming that the PSI report otherwise is

Petitioner further urges that trial counsel should have objected when the state had Stewart identify the intentionally absent Garner via a single photograph at the preliminary hearing. Petitioner, who has the burden of persuasion on federal habeas review, cites no apposite authority establishing that such an objection to this in-court photographic identification would have been successful in Nevada state court at the relevant time. The state supreme court's *Sargent* decision noted previously herein expressly referred to the possibility of the state employing a photographic identification if a defendant opted to not appear at a preliminary hearing. 122 Nev. at 215, 128 P.3d at 1055. Moreover, the Ninth Circuit noted well before Garner's trial that "[t]he Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting." *United States v. Domina*, 784 F.2d 1361, 1367-69 (9th Cir. 1986); *see also Perry v. New Hampshire,* 565 U.S. 228 (2012) (due process does not require an inquiry into the reliability of identification evidence that was not obtained via unnecessarily suggestive circumstances arranged by law enforcement officers). Petitioner has failed to establish that there was a reasonable probability that an objection to the photographic identification would have led to a different outcome at the preliminary hearing, or otherwise.[21]

---

accurate in this regard, the report does not reflect how tall Garner appeared on the night in question in the shoes that he was wearing at the time. Moreover, Stewart testified that Garner was bouncing around like a boxer, trying to intimidate him both by physical presence and spoken word. It is not inconceivable that a thus aggressively "bowed up" Garner very well may have "seemed taller" to the intimidated Stewart, who was induced by Garner's intimidating words and actions to open his wallet up to Garner. In all events, there is not a reasonable probability that such an alleged variance in detail – in Stewart's later description of his assailant – would have given rise to a viable pretrial challenge seeking to exclude the identification evidence.

[21] Here, Garner was identified at the preliminary hearing from a mugshot taken approximately two weeks previously. If he instead had not intentionally absented himself from that hearing, he potentially would have been identified while sitting in jailhouse garb next to defense counsel. Absent apposite authority holding to the contrary, it is difficult to conclude that the first situation – an in-court identification from the single photograph – would be subject to a viable objection when the second situation was not.

Petitioner further maintains, once again without apposite supporting citation, that defense counsel, after waiving Garner's appearance at the preliminary hearing, could have avoided further "taint" (from an identification at the hearing) "by stipulating to identification for the purpose of the preliminary hearing." (ECF No. 62, at 20.) Generally, however, it does not appear that a stipulation necessarily would have prevented the state from proceeding with an in-court identification in one fashion or another. *See, e.g., United States v. Chambers*, 918 F.2d 1455, 1462 (9th Cir. 1990) (prosecution may refuse to accept a defense stipulation and elect instead to prove the elements of the offense by introducing probative evidence). It is entirely

Petitioner maintains that he was prejudiced by counsel's alleged deficient performance "because it prevented him from pursuing any meaningful misidentification defense at trial" given that "[b]y the time of trial, Stewart's identification was tainted by the two prior suggestive identifications and had still not been subjected to any real testing." (ECF No. 62, at 21.) In this vein, Garner suggests that counsel did not renew the motion for corporal lineup after the preliminary hearing "perhaps because it would have been tainted by the suggestive identification procedure he failed to object to at the preliminary hearing." Yet, as discussed above, there was not a reasonable probability that the objections that petitioner wanted counsel to make – to the showup and then to the photographic identification at the preliminary hearing – would have been successful objections under the governing law. Accordingly, if, as petitioner suggests, the "taint" of these two prior identifications is what "prevented him from pursuing any meaningful misidentification defense at trial," any such *arguendo* outcome followed from the law and the record presented rather than from any failure by defense counsel to raise what were nonviable objections. Petitioner therefore cannot establish prejudice under *Strickland* on the showing and argument presented.[22]

This conclusion follows with even greater force when Garner's trial testimony also is taken into account. Garner's testimony—and he took the stand despite the contrary advice of counsel—wholly eliminated any issue as to identification in his case. (*See* text, *supra*, at 7.) Whatever defense counsel could have or would have argued to the jury in closing argument to challenge identification was completely precluded by Garner's own testimony. Garner cannot testify at trial under oath that he was the man who interacted with the victim at the relevant time (albeit in a different manner than testified to by the

speculative on the showing made that there is a reasonable probability that an attempted defense stipulation in this regard would have led to the in-court photographic identification not being made.

[22] Petitioner additionally maintains that defense counsel nonetheless should have renewed the motion for a corporal lineup and retained an eyewitness identification expert. At the outset, it is highly doubtful that prevailing professional norms inexorably require a defense lawyer to take these steps in every case involving identification testimony. In all events, it is entirely speculative on the showing made that such steps would have led to a different outcome at trial or otherwise.

victim) and then viably seek federal habeas relief based on the contention that defense counsel failed to challenge his identification as that individual. That is, after his testimony, he cannot establish a reasonable probability of a different outcome at trial had counsel more extensively challenged a factual point that he himself personally conceded at trial. Garner's own trial testimony is part of the record considered in assessing whether counsel's alleged deficient performance caused resulting prejudice.

Given the application of *Strickland*'s prejudice prong, Garner does not present a substantial claim of ineffective assistance of trial counsel in ground 2. Petitioner therefore cannot overcome the procedural default of the claim under *Martinez*. For substantially the same reasons, the court further holds in the alternative on the merits that ground 2 does not provide a basis for federal habeas relief.

### *Ground 3 – Effective Assistance – Pro se Motion for New Counsel*

In ground 3, petitioner alleges that he was denied effective assistance of counsel when trial counsel did not file a motion for new counsel as requested by Garner. (ECF No. 15, at 15-17.)

This claim is actually unexhausted (because it was not presented to the state appellate courts), but it is technically exhausted by procedural default. Petitioner seeks to overcome the procedural default via *Martinez*. The summary of the state and federal procedural history and the governing law set forth above at pages 24-26 for ground 2 thus also is applicable as well to ground 3—to a point.

Ground 3 is distinguished from ground 2, however, by the fact that state postconviction counsel did pursue the ineffective-assistance claim in the state district court.

At the beginning of the state postconviction evidentiary hearing, counsel informed the court that she wanted to pursue "another potential issue" based upon (a) trial counsel's failure to file a motion for new counsel as requested by Garner; and (b) the state district court's failure to inquire into the matter when Garner stated in court that he wanted a new lawyer and instead telling Garner that he must file a motion. The state had

no objection, and counsel was allowed to proceed. (ECF No. 18-39, at 4-5.) Both counsel thereafter examined trial counsel extensively on these issues, and Garner also testified on the issues. (*Id.*, at 15-21, 31-39, 41-54 & 63-66, 69-71 & 72-74.) Thereafter, counsel for the parties argued both the ineffective-assistance claim and the substantive claim based upon the district court's failure to inquire further. (*Id.*, at 76-79, and in particular *id.*, at 77.) At the end of the hearing, the court stated that no further filings would be needed. (*Id.*, at 82.)

On the following postconviction appeal, appointed counsel pursued only the substantive claim based upon the district court's failure to inquire further. (ECF No. 19-12, at 6 & 11-13.) The state argued in response primarily that the claim exceeded the scope of the earlier remand and that the claim was waived when it was not presented on direct appeal. (ECF No. 19-14, at 5 & 9-13.) The state supreme court held that the claim was waived when it was not presented on direct appeal. (ECF No. 19-19.) The supreme court did not hold that the claim otherwise was not properly presented because it was not contained in Garner's formal postconviction pleadings.

Regardless of the otherwise limited scope of counsel's representation, the record reflects that postconviction counsel was allowed to present, and did present, *inter alia*, a claim of ineffective assistance of counsel in the state district court based upon trial counsel's failure to file a motion for new counsel. Under Nevada state practice, a district court has the discretion to allow the petitioner to raise issues for the first time at the evidentiary hearing. *See, e.g., Barnhart v. State*, 122 Nev 301, 303-04, 130 P.3d 650, 651-52 (2006); *cf. Yount v. Criswell Radovan, LLC*, 469 P.3d 167 (Nev. 20201) (issues tried by consent are treated as if raised in the pleadings and formal amendment of the pleadings then is not required).[23]

---

[23] *Barnhart* states that the district court "could" allow the parties to file supplemental pleadings after the evidentiary hearing, 122 Nev. at 303, 130 P.3d at 652, but the opinion does not state that the court was required to do so. As discussed in the text, the district court did not require any supplemental filings in this case; and the state supreme court made no holding that the accompanying substantive claim that was pursued on the postconviction appeal was not encompassed within Garner's claims. Given that Garner actually raised ground 3 through counsel in the state district court, this court, in contrast to the analysis of ground 2, accordingly makes no *arguendo* assumption that Garner did not have counsel on this claim in

33

What counsel did not do, however, was pursue the ineffective-assistance claim in the ensuing appeal. She pursued instead only the theretofore companion substantive claim, and no holding was made that Garner could not pursue that claim because it was not contained in the formal pleadings.

The *Martinez* decision represents a "narrow exception" to the general rule in *Coleman v. Thompson*, 501 U.S. 722 (1991), that ineffective assistance of postconviction counsel does not constitute cause to overcome a procedural default. 566 U.S. at 9. In *Coleman*, the procedural default followed from postconviction counsel not timely pursuing the claims in a state postconviction appeal. 501 U.S. at 727 & 752-57. In *Martinez*, the supreme court recognized a narrow exception to *Coleman* for claims that, *inter alia*, were not pursued instead in the initial-review collateral proceeding, which here corresponds to the state postconviction proceedings in the district court. In the present case, appointed counsel presented the ineffective-assistance claim in the state district court but did not pursue the claim in the state postconviction appeal. The situation thus falls under the general rule and holding of *Coleman* rather than under the narrow exception recognized in *Martinez*. Garner therefore cannot overcome the procedural default of ground 3 via *Martinez*.

Ground 3 accordingly will be dismissed as procedurally defaulted.[24]

IT THEREFORE IS ORDERED that the petition, as amended, is DENIED and that the claims therein shall be DISMISSED with prejudice (a) on the merits as to grounds

_____

the state district court. Again, regardless of the limitations otherwise on the scope of counsel's appointment generally, she was allowed to pursue and did pursue this specific claim. Garner therefore cannot establish cause under *Martinez* as to ground 3 based specifically on the premise that he had no appointed postconviction counsel pursuing this claim.

[24] While respondents presented different specific argument in the answer, "a court is not hidebound by the precise arguments of counsel." *United States v. Sineneng-Smith*, 140 S.Ct. 1576, 1581 (2020). Under controlling precedent, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991); *see also Does v. Wasden*, 982 F.3d 784, 793 (9th Cir. 2020). Here, the proper construction of governing law on the procedural default issue that properly is before the court is that *Coleman* rather than *Martinez* controls because ground 3 was pursued by postconviction counsel in the state district court but thereafter not in the postconviction appeal.

1(a), 1(b) and 1(c); (b) as procedurally defaulted and in the alternative on the merits as to ground 2; and (c) as procedurally defaulted as to ground 3.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED. For the reasons discussed herein, to the extent that claims were decided on the merits, reasonable jurists would not find the district court's assessment of the constitutional claims to be debatable or wrong; and to the extent that claims were decided on procedural grounds, jurists of reason would not find it debatable whether the district court was correct in its procedural ruling.

IT IS FURTHER ORDERED that the clerk shall SUBSTITUTE William Hutchings as respondent for respondents Cox and Filson.

The clerk of court shall enter final judgment accordingly, dismissing the action with prejudice and closing this case.

DATED: June 28, 2021.

_____
JAMES C. MAHAN
United States District Judge

35